[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Griffith v. Aultman Hosp.,* Slip Opinion No. 2016-Ohio-1138.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1138

GRIFFITH, EXR., APPELLANT, *v.* AULTMAN HOSPITAL, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Griffith v. Aultman Hosp.,* Slip Opinion No. 2016-Ohio-1138.]

*Medical records—R.C. 3701.74—Data generated in the process of a patient's healthcare treatment that pertains to the patient's medical history, diagnosis, prognosis, or medical condition qualifies as a medical record— The physical location of the data is not relevant to the determination whether than data qualifies as a medical record.*

(No. 2014-1055—Submitted September 2, 2015—Decided March 23, 2016.)

APPEAL from the Court of Appeals for Stark County,

No. 2013CA00142, 2014-Ohio-1218.

_____

**KENNEDY, J.**

{¶ 1} In this appeal from the Fifth District Court of Appeals, we consider the definition of "medical record" as it is used in R.C. 3701.74. Appellant, Gene'a Griffith ("Griffith"), advances the following proposition of law: "A hospital should not be permitted to withhold portions of a patient's medical record by unilaterally

selecting and storing those medical records in a department other than its medical records department."

{¶ 2} For the reasons that follow, we conclude that because the Ohio General Assembly did not limit the definition of "medical record" in R.C. 3701.74(A)(8) to data in the medical-records department, the physical location of the data is not relevant to the determination whether that data qualifies as a medical record. Instead, the focus is whether a healthcare provider made a decision to keep data that was generated in the process of the patient's healthcare treatment and pertains to the patient's medical history, diagnosis, prognosis, or medical condition. We hold that for purposes of R.C. 3701.74(A)(8), "maintain" means that the healthcare provider has made a decision to keep or preserve the data.

{¶ 3} We reverse the judgment of the court of appeals and remand the matter to the trial court.

## I. Facts and Procedural History

### A. Howard's Surgery and Death

{¶ 4} On May 2, 2012, Howard Griffith ("Howard"), Gene'a Griffith's father, was admitted by appellee, Aultman Hospital, for surgery. After being transferred out of intensive care to a step-down unit, Howard developed intermittent atrial fibrillation and was placed on continuous cardiac monitoring.

{¶ 5} Around 4 a.m. on May 6, 2012, a nurse in the step-down unit assessed Howard and found that he was doing well. About 45 minutes later, an x-ray technician found Howard in his bed with his gown ripped off, the cardiac monitor no longer attached to his body, his central line lying on the floor, and his chest tube disconnected. Howard was unresponsive and did not have a heartbeat. Medical personnel resuscitated him and moved him to the intensive-care unit. However, Howard had suffered severe brain damage and after he made no neurological improvement, his family decided to remove him from life support on May 7, 2012. Howard died approximately nine hours later on May 8, 2012.

**B.      Requests for Howard's Medical Record**

{¶ 6} On July 24, 2012, Griffith requested a copy of Howard's complete medical record. The hospital provided some documents in response to this request. Another written request was made on October 17, 2012. On October 22, 2012, the hospital produced the medical record for the period May 2 through 8, 2012, that existed in the medical-records department. On December 12, 2012, Griffith's representative made an in-person request and was permitted to review what was represented to her as the complete medical record. On December 14, 2012, another written request was made for the medical record. On December 31, 2012, the hospital again produced the medical record that existed in the medical-records department for the period May 2 through 8, 2012.

{¶ 7} Griffith then filed this action pursuant to R.C. 3701.74 and 2317.48 to compel the production of Howard's complete medical record. The complaint alleged that the hospital had failed to produce any monitoring strips or nursing records from Howard's hospital stay.

{¶ 8} After filing the complaint, Griffith served the hospital with requests for admissions and interrogatories. In response, the hospital admitted that prior to filing the action, it had failed to produce Howard's "entire and complete medical record in response" to each of Griffith's medical-record requests. In the answer to interrogatories, Jennifer Reagan-Nichols, the director of medical records and transcription at the hospital, verified that after Griffith filed the action, the hospital produced Howard's entire medical record. Contemporaneously with the answer, the hospital produced hard copies of cardiac-monitoring data from May 6, 2012, "as responsive documents from the visit that are not part of the medical record." Thereafter, Reagan-Nichols was deposed.

{¶ 9} In the initial deposition on March 11, 2013, Reagan-Nichols testified that the hospital had produced Howard's cardiac-rhythm strips from 4:00 a.m. to 4:51 a.m. on May 6 in response to the request for documents. While monitoring

strips for a patient that are received by her department would be made part of the medical record, she explained that Howard's printouts were not part of his medical record because the nursing staff had not provided them to the medical-records department. She did not know who directed the nurses not to print Howard's data. Reagan-Nichols did not know whether the strips met the legal definition of medical record, but she did not have any reason to believe they did not meet the definition.

{¶ 10} On March 14, 2013, the hospital filed a motion for summary judgment, arguing that a complete copy of Howard's medical record had been produced. In support, the hospital provided the sworn interrogatory answers of Reagan-Nichols.

{¶ 11} On March 27, 2013, Reagan-Nichols submitted an errata sheet to correct some of her deposition testimony. In that sheet, she stated that the May 6 rhythm strips did not meet the legal definition of medical records. She also stated that the rhythm strips "were printed from electronic monitoring equipment after the discharge of the patient at the direction of hospital Risk Management. The data in this equipment is not part of the medical record."

{¶ 12} Subsequently, the trial court ordered a second deposition to address the issues presented by the errata sheet. In that deposition, Reagan-Nichols stated that to make sure her answers in her first deposition were correct, she asked questions of the hospital's director of risk management and a registered nurse with the cardiac unit. Reagan-Nichols testified, based on information she had received from the hospital's director of risk management, that the May 6 rhythm strips provided to Griffith were printed from Howard's cardiac monitor by a registered nurse after Howard's death at the direction of the hospital's risk-management department. She did not know when risk management ordered the nurse to print Howard's data or whether the nurse printed all the data on the monitor relevant to Howard.

**{¶ 13}** Reagan-Nichols stated that the cardiac monitor electronically stored a patient's data for 24 hours after that patient's discharge. After 24 hours, however, the information was deleted from the monitor unless a physician ordered that the data be saved. Reagan-Nichols did not know for how long the data would be saved. She believed that all of Howard's monitoring data was saved. With respect to Howard, Reagan-Nichols did not know if "discharge" meant his transfer from the step-down unit to the intensive-care unit or after his death.

**{¶ 14}** After the second deposition, the hospital produced a cardiac-rhythm strip for Howard from May 3, 2012, at 2:51 a.m. without qualification.

## C. Lower Court Proceedings

**{¶ 15}** The trial court granted summary judgment in favor of the hospital. It concluded that the hospital had produced Howard's medical record, as defined by R.C. 3701.74(A)(8).

**{¶ 16}** On appeal, the Fifth District affirmed the trial court's judgment in a two-to-one decision. The majority agreed with the hospital that the word "maintained" in R.C. 3701.74(A)(8) pertains only to records that " 'a hospital determines needs to be maintained by a health care provider in the process of a patient's health care' ": " 'not everything having to do with the patient' " and " 'not that which a Plaintiff in a * * * medical malpractice case thinks should be maintained.' " 2014-Ohio-1218, ¶ 22, quoting the argument made by the hospital attorney on the motion for summary judgment. Therefore, the court held that "the medical record consists of what was maintained by the medical records department and information that the provider decides not to maintain is not part of the medical record." *Id.* Documents kept by any other department, including risk management, "do not meet the definition of a medical record because they were not 'maintained' by the medical records department." *Id*. at ¶ 30. Because the hospital had certified that it produced Howard's medical records, as that term was defined by the statute,

the court of appeals found that the trial court did not err in granting summary judgment for the hospital. *Id*. at ¶ 22.

## II.     Law and Analysis

{¶ 17} This appeal requires us to determine what constitutes a "medical record" as that term is used in R.C. 3701.74(A)(8). We agree with the Fifth District that the term "medical record" in R.C. 3701.74(B) does not include all patient data but includes only that data that a healthcare provider has decided to keep or preserve in the process of treatment. However, the Fifth District erred in holding that the medical record consists only of information maintained by the medical-records department. The statute defines "medical record" to mean any patient data "generated and maintained by a health care provider," without any limitation as to the physical location or department where it is kept. R.C. 3701.74(A)(8). We therefore remand this cause to the trial court to determine whether the hospital met its burden on a motion for summary judgment to show that it had produced Howard's entire "medical record" in accordance with our decision.

## A.     Definition of "medical record" in R.C. 3701.74(A)(8)

{¶ 18} When interpreting a statute, this court's paramount concern is legislative intent. *State ex rel. United States Steel Corp. v. Zaleski*, 98 Ohio St.3d 395, 2003-Ohio-1630, 786 N.E.2d 39, ¶ 12. "[T]he intent of the lawmakers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation." *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus. We apply the statute as written, *Boley v. Goodyear Tire & Rubber Co.*, 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 20, and we refrain from adding or deleting words when the statute's meaning is clear and unambiguous, *Armstrong v. John R. Jurgensen Co.*, 136 Ohio St.3d 58, 2013-Ohio-2237, 990 N.E.2d 568, ¶ 12.

6

{¶ 19} R.C. 3701.74(B) sets forth the procedure by which a "patient, a patient's personal representative, or an authorized person" may "examine or obtain a copy of part or all of a medical record." "Medical record" is defined as "data in any form that pertains to a patient's medical history, diagnosis, prognosis, or medical condition and that is generated and maintained by a health care provider in the process of the patient's health care treatment." R.C. 3701.74(A)(8).

{¶ 20} The meaning of the word "maintain" lies at the heart of this dispute. The hospital argues that "maintain" connotes an exercise of discretion and a level of management that brings the data into a discrete set of records. Therefore, the medical record, according to the hospital, consists of the information that the healthcare provider deems appropriate to maintain in a discrete location for the care of the patient. Griffith argues, consistent with the view of the Fifth District's dissenting judge, that the statute does not authorize the hospital to limit the medical record to include only those records it sends to its medical-records department.

{¶ 21} The legislature did not define "maintain" in R.C. 3701.74. Moreover, the word has not "acquired a technical or particular meaning, whether by legislative definition or otherwise," that we are required to apply here. R.C. 1.42. Therefore, to resolve the question, we look to the ordinary, common meaning of the word "maintain." *See Weaver v. Edwin Shaw Hosp.,* 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 12.

{¶ 22} "Maintain" is defined as "[t]o continue in possession of." *Black's Law Dictionary* 1097 (10th Ed.2014). Contrary to the hospital's assertion, the definition of "maintain" does not depend on a managerial decision to keep or preserve the data in a discrete location or file. Instead, the ordinary and common meaning conveys that the healthcare provider has made a decision to keep or preserve the data.

{¶ 23} R.C. 3701.74(A)(8) does not state that a medical record must be kept in a specific physical location. To interpret R.C. 3701.74(A)(8) as limiting a

medical record to data, generally or in a discrete set, in the medical-records department would require us to insert words not used by the General Assembly. "In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used." *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50, 524 N.E.2d 441 (1988), paragraph three of the syllabus.

{¶ 24} By comparison, Ark.Code Ann. 16-46-402 defines "medical records" as "health care records * * * maintained by the medical records department of a * * * medical facility." The Arkansas General Assembly expressed the intent that the record must be in the physical location of the medical-records department. The Ohio General Assembly did not.

{¶ 25} We therefore disagree with the reasoning of the Fifth District and conclude that the physical location of patient data is not relevant to the determination whether that data qualifies as a medical record under R.C. 3701.74(A)(8). Rather, the definition focuses on whether a healthcare provider made a decision to keep data that was generated in the process of the patient's healthcare treatment and pertains to the patient's medical history, diagnosis, prognosis, or medical condition.

## B.      The hospital's evidentiary burden

{¶ 26} We now consider whether the hospital met its burden on a motion for summary judgment to show that there was no genuine issue of material fact that it produced Howard's entire medical record. *See* Civ.R. 56(C). A party seeking summary judgment "bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt,* 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). The hospital argued in its motion for summary judgment that it had met its initial burden by producing a certified copy of Howard's medical

record as it existed in the medical-records department. According to the hospital, the May 6 cardiac-monitoring strips, which were printed after discharge at the direction of the risk-management department, did not meet the definition of "medical record" because they were not kept in the medical-records department.

{¶ 27} Reagan-Nichols testified that the data on the cardiac monitor is deleted 24 hours after discharge unless it is saved at the direction of a physician. If indeed saved at the direction of a physician before discharge, the cardiac-monitoring information—and other patient data saved by a healthcare provider but not kept in the medical-records department—would fall under the definition of "medical record." However, because the proceedings below focused only on medical records kept in the hospital's medical-records department, the record before us is insufficient to determine whether the hospital produced the entirety of Howard's medical record. Therefore, we remand to the trial court to apply the definition of medical record as set forth in this decision, to order further proceedings if needed to develop the evidentiary record, and to make a determination whether the hospital has met its burden.

**C.    No requirement in R.C. 3701.74 to state a reason when requesting medical records**

{¶ 28} Finally, we conclude that the plain language of R.C. 3701.74 does not require that a patient seeking a medical record state a reason for doing so. The Fifth District found that the purpose of R.C. 3701.74 is to "enable the patient to obtain his or her file in order, for example, to obtain a second opinion or transfer to another medical provider." 2014-Ohio-1218, ¶ 23. Justice Lanzinger's dissenting opinion suggests that settlement of Griffith's medical-malpractice action moots any further inquiry into the production of the medical record. In establishing a patient's right of access to medical records, however, the General Assembly has not imposed upon the patient or the patient's representative any burden of demonstrating a reason for accessing the medical record. All that is required of a patient or a

patient's representative is to "submit to the health care provider a written request signed by the patient * * * dated not more than one year before the date on which it is submitted."  R.C. 3701.74(B).

### III.  Conclusion

**{¶ 29}** Because the Ohio General Assembly did not limit the definition of "medical record" in R.C. 3701.74(A)(8) to data in the medical-records department, the physical location of the data is not relevant to the determination whether that data qualifies as a medical record.  Instead, the definition focuses on whether a healthcare provider made a decision to keep data that was generated in the process of the patient's healthcare treatment and that pertained to the patient's medical history, diagnosis, prognosis, or medical condition.  We hold that for purposes of R.C. 3701.74(A)(8), "maintain" means that the healthcare provider has made a decision to keep or preserve the data.

**{¶ 30}** The judgment of the court of appeals is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

PFEIFER, FRENCH, and O'NEILL, JJ., concur.

O'CONNOR, C.J., concurs in judgment only.

O'DONNELL, J., dissents with an opinion.

LANZINGER, J., dissents with an opinion.

_____

**O'DONNELL, J., dissenting.**

**{¶ 31}** Respectfully, I dissent.

**{¶ 32}** Records generated and maintained by a hospital's risk management department for risk-management purposes following the death of a patient are not records "used in the process of a patient's health care treatment," and therefore, they are not "medical records" as defined by R.C. 3701.74(A)(8). Accordingly,

because Aultman Hospital produced the entire medical record of Howard Griffith and is entitled to judgment as a matter of law in connection with the request for the production of documents, I would affirm the judgment of the Fifth District Court of Appeals.

**Facts and Procedural History**

**{¶ 33}** On May 2, 2012, Aultman Hospital admitted Howard Griffith for surgery to remove a portion of his left lung. Following that surgery, he developed intermittent atrial fibrillation, and the hospital placed him on continuous cardiac monitoring. On May 6 around 4:00 a.m., a nurse assessed him, but approximately 45 minutes later, an x-ray technician found him unresponsive with the leads to his cardiac monitor detached from his chest and without a heartbeat. Medical personnel resuscitated him and placed him on life support, but his family decided to remove him from life support, and he died on May 8. The discharge summary dated May 12, 2012, stated that "a retrospective review of his monitor at the nurse's station showed that the EKG leads did not show any kind of rhythm," starting around 4:00 in the morning, until the x-ray tech found him.

**{¶ 34}** Gene'a Griffith, executor for the estate of Howard E. Griffith, subsequently attempted to obtain a complete copy of her father's medical record. Aultman Hospital provided her with the medical record maintained by its medical records department, but after reviewing the documents provided by the hospital, Griffith believed she had not received the complete medical record. As a result, she filed this action to compel the production of the complete medical record in accordance with R.C. 3701.74 and 2317.48.

**{¶ 35}** The complaint alleged that the hospital failed to produce any monitoring strips from the cardiac monitor or any nursing records from her father's stay in the hospital. The hospital denied that it had withheld the complete medical record, but it nonetheless produced monitor strip printouts "as responsive documents from the visit that are not part of the medical record." The printed strips

from the cardiac monitor reflected the activity from 4:00 a.m. to 4:51 a.m. on May 6, 2012.

{¶ 36} Griffith then deposed Jennifer Reagan-Nichols, Aultman Hospital's medical records director, who explained that the medical records department does not maintain all medical data generated during a patient's stay at the hospital— printing out all of the data from the equipment monitoring patients 24 hours a day would result in "loads of paper in your chart." She noted that a doctor or a nurse had discretion to make printouts from the monitoring strips part of the medical record by sending them to the medical records department, but she also testified that "the nursing staff does not provide them to us" and that the electronic data on the monitoring machines is not accessible to or maintained by the medical records department as part of a patient's medical record.

{¶ 37} According to Reagan-Nichols, the monitoring data is retained only for 24 hours after a patient's discharge; after that time, the machine automatically deletes the data unless a doctor ordered it saved. Thus, she explained, if medical data is not documented by a doctor or a nurse, it is not maintained as part of the patient's medical record by the hospital.

{¶ 38} When asked whether Griffith's electronic monitoring data had been retained on the monitoring equipment after his death, Reagan-Nichols testified, "I don't know." However, she explained that the monitoring strips provided in discovery "were printed from electronic monitoring equipment after the discharge of the patient at the direction of hospital Risk Management" and stored there and that "[t]he data in this equipment is not part of the medical record." She clarified that Cathy Rainieri, the director of the risk management department, had ordered the charge nurse on the cardiac floor to print out the electronic monitoring data after Howard Griffith's death and subsequent discharge from the hospital. Reagan-Nichols could not say whether the charge nurse printed out all of the data from the equipment or just a part of it.

12

{¶ 39} The trial court granted summary judgment to Aultman Hospital, finding that it had produced the complete medical record. The Fifth District affirmed that judgment, concluding that "the medical record consists of what was maintained by the medical records department and information that the provider decides not to maintain is not part of the medical record." 2014-Ohio-1218, ¶ 22. The appellate court also noted that R.C. 3701.74 is a miscellaneous provision to enable a patient to obtain his or her file, not a broad discovery device.

## Law and Analysis

{¶ 40} On appeal to this court, Griffith presents one proposition of law: "A hospital should not be permitted to withhold portions of a patient's medical record by unilaterally selecting and storing those medical records in a department other than its medical records department." This proposition of law implies that a health care provider could conceal a medical record by storing it in a location other than the provider's medical records department. This focus on concealment and location is misleading.

{¶ 41} R.C. 3701.74(A)(8) defines "medical record" to mean "data in any form that pertains to a patient's medical history, diagnosis, prognosis, or medical condition and that is generated and maintained by a health care provider in the process of the patient's health care treatment." A careful reading of this statute reveals that a health care provider is required to produce only those records it has generated and maintained in the process of the patient's health care treatment.

{¶ 42} Thus, a demonstration that medical data exists or has been generated and maintained by a hospital does not automatically require that it be produced as a medical record. Rather, the General Assembly has directed health care providers to give access to medical records as defined in the statute—data that pertains to medical history, diagnosis, prognosis, or medical condition and that is *generated and maintained* by a health care provider *in the process of the patient's health care treatment*. The legislature could have mandated that health care providers maintain

and produce all patient data generated for any purpose, but it did not do so. Rather, it particularly specified that medical records are those generated and maintained by a medical provider in the process of the patient's health care treatment. Thus, to resolve this appeal, we only need to apply R.C. 3701.74 as written.

{¶ 43} Although Aultman Hospital electronically monitored Howard Griffith on a cardiac monitor during the course of his stay, no provider maintained that data in the process of Griffith's treatment. Here, the facts show that Aultman Hospital's risk management department generated and maintained the cardiac monitoring strips at issue here following his discharge from the hospital. At that point, the hospital was no longer providing any medical care to him, and therefore, the risk management department could not have generated and maintained that data "in the process of the patient's health care treatment." The department's purpose for maintaining this data is not immediately apparent from this record, but it is manifest that it was not in furtherance of providing health care treatment. It is also apparent that a health care provider did not generate or maintain this data in the process of the patient's treatment.

{¶ 44} For these reasons, these documents are not medical records that R.C. 3701.74 required Aultman Hospital to produce.

**Conclusion**

{¶ 45} The evidence shows that Aultman Hospital produced the complete medical record from its medical records office in conformity with Griffin's request. The disputed cardiac monitor strips are not medical records as defined by R.C. 3701.74(A)(8) because they were not generated and maintained by a health care provider in the process of Howard's health care treatment. Rather, the risk management department of Aultman Hospital generated them for its own purposes after Howard Griffin's death. Accordingly, although Aultman Hospital produced this data in discovery, it had no obligation to do so.

**{¶ 46}** For these reasons, I would affirm the judgment of the Fifth District Court of Appeals.

_____

**LANZINGER, J., dissenting.**

**{¶ 47}** I respectfully dissent. In reversing the court of appeals' judgment and remanding to the trial court, the majority continues an action in which appellant, Gene'a Griffith, seeks records for a wrongful-death claim that has already been settled. There is no real controversy between the parties, and res judicata bars the action since both the claim for production of documents and the underlying claim for malpractice are founded on the medical care provided to the decedent, Howard Griffith. I would dismiss this appeal on that basis, and I respectfully dissent from the majority's decision to reverse the judgment of the court of appeals and remand to the trial court.

**{¶ 48}** Although the majority reads the word "maintain" within the statute defining "medical records" to mean "keep or preserve," by reversing the judgment in this case, the majority sidesteps the crucial argument made by appellee, Aultman Hospital, that the healthcare provider should have discretion to decide when data should be considered part of the patient's medical record. I do agree that R.C. 3701.74(A)(8) does not require that data be stored in a particular place to qualify as medical records, but I do not agree that the Fifth District permitted the healthcare provider to define a medical record based solely on the place where the data is stored. The appellate court affirmed the grant of summary judgment by adopting appellee's understanding of the word "maintain":

"[T]he only meaning that can [be] attached to it, is that the hospital record is to be that which the hospital maintains, not that which a Plaintiff in a legal malpractice case—or in a medical malpractice case thinks should be maintained, not everything having

to do with the patient, but that which a hospital determines needs to be maintained by a health care provider in the process of a patient's health care."

2014-Ohio-1218, ¶ 22.

{¶ 49} The court of appeals then simply determined that the trial court had not erred in granting summary judgment on the facts presented, namely that "the medical record consists of what was maintained by the medical records department and information that the provider decides not to maintain is not part of the medical record." *Id.*

{¶ 50} The definition of "medical record" within R.C. 3701.74(A)(8) may be broken down into four components: 1) *any* data, regardless of its form 2) pertaining to a patient's history, diagnosis, prognosis, or medical condition 3) generated and maintained by a healthcare provider 4) in the process of the patient's health care treatment. A "health care provider" is defined in R.C. 3701.74(A)(5) as "a hospital, ambulatory care facility, long-term care facility, pharmacy, emergency care facility or health care practitioner." And a "health care practitioner" is broadly defined in 3701.74(A)(4)(a) through (r) to cover all types of medical professionals.

{¶ 51} Appellee and amici curiae[1] detailed the current status of recordkeeping and explained that a hospital must handle its data pursuant to all laws and regulations, including R.C. 3701.74, to which it is subject. They also have raised serious practical concerns over appellant's interpretation of the statute and the unintended consequences that would follow. The judgment of treating healthcare providers must be relied upon to determine what is (or is not) part of a

---

[1] The Academy of Medicine of Cleveland and Northern Ohio and the Ohio Hospital Association, the Ohio State Medical Association, the Ohio Osteopathic Association, and the Ohio Alliance for Civil Justice filed briefs in support of appellee.

patient's medical record, those providers being best able to determine what information is relevant to a patient's treatment. Hospitals and other providers have teams of employees dedicated to collecting and maintaining this information, and, as the amici curiae have noted, many hospitals have multidisciplinary committees that determine what information should be included in a medical record. The information in the medical record presents the relevant and necessary information that is always subject to being supplemented in the clinical judgment of the treating providers.

{¶ 52} In the highly regulated area of health care, appellant's concerns over the routine "sanitization" of medical records are overblown. The purpose of R.C. 3701.74 is to deliver medical records to patients upon request both efficiently and cost-effectively, but nothing in the statute suggests it is to be a broad discovery tool. While a medical record may include data in any form, R.C. 3701.74(A)(8) specifies that in order for data to be a part of the medical record, that data must be generated and maintained by the healthcare provider "*in the process of the patient's health care treatment*." (Emphasis added.) This language implies that it is within a hospital's discretion, through its employees, to select, preserve, and store records relevant to the health care of a particular patient in the manner it sees fit.

{¶ 53} In my view, there are no material issues of fact in this case, even if it were appropriately before us. R.C. 3701.74(A)(8) permits a healthcare provider to exercise discretion in generating and retaining a specific set of records for a patient's healthcare treatment. Those records were, in fact, provided to appellant. The record and subsequent filings show that appellant obtained the additional information she requested through interrogatories and that the parties have already settled their case. It is difficult to know what the trial court should do upon remand, because any order for the further production of records would have no effect. Because I do not believe there is a case or controversy before us, I would dismiss this appeal, and I therefore respectfully dissent.

_____

Tzangas Plakas Mannos, Ltd., Lee E. Plakas, and Megan J. Frantz Oldham, for appellant.

Milligan Pusateri Co., L.P.A., Richard S. Milligan, Paul J. Pusateri, and Thomas J. Himmelspach, for appellee.

Vivian Whalen Duffrin and Kathleen Tatarsky, urging reversal for amicus curiae Stark County Association for Justice.

Willis & Willis Co., L.P.A., and Mark C. Willis, urging reversal for amici curiae Ohio Association for Justice and Summit County Association for Justice.

Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Kathleen J. St. John, and David M. Paris, urging reversal for amicus curiae AARP.

Freking & Betz and Mark W. Napier, urging reversal for amicus curiae Southwest Ohio Trial Lawyers Association.

Reminger Co., L.P.A., Martin T. Galvin, and David Valent, urging affirmance for amicus curiae Academy of Medicine of Cleveland and Northern Ohio.

Squire Patton Boggs, L.L.P., Keith Shumate, and Heather Stutz, urging affirmance for amici curiae Ohio Hospital Association, Ohio State Medical Association, Ohio Osteopathic Association, and Ohio Alliance for Civil Justice.

Sean McGlone, urging affirmance for amicus curiae Ohio Hospital Association.

_____